leged that the metal furnished by the plaintiffs was found to be unsatisfactory in every respect, and that the defendant has been at all times ready and willing to carry out said contract, but that the plaintiffs have neglected and refused to carry out the said contract on their part, and have committed a breach of the contract, in that they have failed to furnish the defendant the metals referred to in said complaint rolled to the thickness required and satisfactory in every respect, and at the price set forth in the contract, as a counterclaim for which the defendant asked an affirmative judgment of $12,000. While I have doubts as to whether there was evidence to sustain the counterclaim, I think the evidence was competent upon the question as to whether the plaintiffs had complied with their contract, and had furnished coated metal as provided for by the contract. Certainly, if the plaintiffs had failed to furnish the metal contemplated by the contract suitable for the manufacture of these collapsible tubes that was reasonably satisfactory to the defendant for that purpose, it was not a breach of the contract for the defendant to purchase from others such metal as would answer the purpose for which both parties understood the metal was to be used. The rule contended for by the plaintiffs that an objection to the metal as not complying with the contract would not survive acceptance by the vendee has no application, as that applies only to an action for the purchase price, and that the defendant has recognized by paying for the metal that was purchased. The question here is whether there was a breach of the contract by reason of the defendant purchasing the metal from others, and I think upon that question it was competent for the defendant to show that the metal furnished by the plaintiffs was not of the quality or character required by the contract, and that, in consequence of the failure of the plaintiffs to furnish the coated metal that the contract required, the defendant was compelled to go out and purchase other metal in order to carry on its business. The question was as to whether there was a breach by the defendant, and it seems to me that there was no breach if the act of the defendant in purchasing the metal from others was made necessary by the quality of the metal that had been furnished by the plaintiffs, and which was of itself a violation of the contract by the plaintiffs. I think this evidence should have been admitted, and it was error to exclude it.

It follows that the judgment and order must be reversed and a new trial ordered, with costs to the appellant to abide the event. All concur.

---

(123 App. Div. 208.)

JOHNSON v. STEVENS.

(Supreme Court, Appellate Division, Fourth Department.   January 8, 1908.)

MASTER AND SERVANT—INJURIES TO THIRD PERSONS—PROXIMATE CAUSE—EVIDENCE.

In an action for injuries caused by defendant's runaway team, escaping from defendant's servant in charge thereof, evidence *held* sufficient to require submission to the jury of the question whether the runaway was caused by part of the load falling on the team, owing to an unsafe

and unsuitable wagon on which to haul the load, so that a dismissal of the complaint was erroneous.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 1274.]

McLennan, P. J., dissenting.

Exceptions from Trial Term, Cayuga County.

Action by George W. Johnson against Herbert L. Stevens. Exception by plaintiff to dismissal of the complaint, ordered to be heard in the first instance in the Appellate Division. Exception sustained, and new trial ordered.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

James S. Bryan (Frank S. Coburn, of counsel), for appellant.
Albert H. Clark, for respondent.

ROBSON, J. Plaintiff was injured by a runaway team, owned by defendant, which had escaped from defendant's servant, in whose charge it was, and while he was engaged in the prosecution of defendant's business. The complaint may be summarized as charging that defendant directed his servant to transport, with defendant's team and wagon, two large packing boxes from one point to another in the city of Auburn, and that the wagon furnished for that purpose was, by reason of defendant's negligence, not provided with a wagon box, stakes, or ropes, by which the boxes could be secured thereon; that the team was a spirited one, and such equipment was unsafe and unsuitable for the purpose for which it was to be used, and defendant's servant, without any means or appliances for securing the packing boxes on the wagon, negligently engaged in the work of moving, and did attempt to move said boxes with said unsafe and unsuitable team, wagon, and equipment in so negligent and careless a manner "that one of said packing boxes and defendant's said servant fell from said wagon, and thereby startled and frightened the said horses of defendant, and caused them to run and get beyond the control of defendant's said servant," and that said team running thereafter furiously and unattended and uncontrolled by any driver collided with a wagon in plaintiff's charge as driver thereof, and caused him serious injuries, for which he seeks recovery in this action. The evidence in regard to the team, wagon, method of loading the boxes, and the beginning of the runaway is furnished by the driver of the team, whom plaintiff called as his witness. From his testimony it appears that the bed of the wagon was made of plank without any sides, and that it was to some extent wet and consequently slippery. The packing boxes were large, and placed lengthwise on the wagon covered the surface of the plank platform, except about six inches at the forward end. The driver after loading the boxes, without securing them by ropes or otherwise, got into the forward box, which was at least two and a half feet high, and started to drive through a lane, leading from the place where the boxes were loaded, to the street. There was a turn in the lane, and, as he passed this point, the off horse, which was tough-bitted and somewhat nervous and excitable, was startled by the snapping of a sheet sus-

pended from a line at or near this point, the movement and conse-
quent snapping of the sheet being caused by the wind, which was then
blowing. As he says, the off horse jumped when the sheet snapped,
and the second jump it made pitched the box and him forward and
off the wagon. The jumps were as soon as the horse could make them.
They were almost instantaneous. In the twinkling of an eye, as he de-
scribes it, without any warning, he was forward, the box was on him, and
the horses were running away. He further says that the snapping of
the sheet caused the off horse to jump and run; and the team had gone
some 35 or 40 feet before the box and driver fell off. He fell between
the horses. The trial court held in granting the nonsuit that plaintiff's
evidence failed to establish the cause of action which plaintiff had
pleaded, in that there was no evidence that the team was frightened
and caused to run away by the fall of the box and the driver, which
alone the complaint alleges as occasioning the runaway.

In thus holding we think that the court failed to give its due weight
to some further testimony given by this same witness when further re-
lating what occurred after the off horse was startled by the snapping
of the sheet. He says:

"I had a good snug hold on the reins when the horse made her first jump.
At the second jump, I braced myself and tried to hold her, and the box gave
way with me. I exerted my whole strength on it. * * * Comparing
with the first jump, she jumped harder and stronger the second time than she
did the first time. She jumped just as quick as she could, and gathered her-
self like any horse trying to get away. The two jumps were almost instan-
taneous. There wasn't time between the two so that I could fairly distinguish
them. The nigh horse did not jump. They were moving at the time the
box tipped and fell. If the box touched either of the horses, it touched the
nigh horse. I don't know for certain whether it did touch the horse. I
wasn't in the box exactly long enough to tell you how it rested on the whiffle
trees. When it went over, I jumped out. I didn't have time to see what it
was resting on. The nigh horse was a quiet one. She didn't want to run
away. She held back until the box fell. I think the box went out on her
side, and perhaps scared her, and from that time they were together. As far
as I could see as the team were running down out of the laneway, the nigh
horse held back. I could see out at the end of the lane and across the street
and she was holding back then. I can't say she was jumping. The other
mare was jumping, and pulling and trying to get away from her. I can't say
whether she was on a trot or a run. * * * I observed a change in her ac-
tions from the time the box dropped—the nigh horse. I don't know whether
it was me scaring her getting between her, or the box. I did notice and ob-
serve the change. She was loose, and the other one was pulling her away.
* * * The nigh one didn't appear to be so scared as the other one, and
appeared to be holding back. She ceased to hold back after she got away, aft-
er I tipped over."

From this evidence which we have quoted at length it clearly ap-
pears that the team as a team was not beyond the driver's control,
was not in fact running away until after the box fell and startled the
near horse. The jury, if the case had been submitted to them, might
have found from this evidence, taken in connection with the other
evidence, to which we have above adverted, that, while the off horse
had been frightened by the snapping of the sheet and was running
and jumping in her effort to escape control of the driver, yet, so long
as the other horse held back, the issue of her effort to escape from
the driver's control was at least doubtful, until the unsecured box with

the driver therein was drawn forward on the wagon and fell with the driver between the horses; that the near horse was frightened thereby, and then and not till then, escaping from the control of the driver, joined its mate in running away, resulting in the collision by which plaintiff was injured. Such a finding would have been warranted by the evidence; and would have been clearly within the charge of the complaint:

"That one of the packing boxes and defendant's said servant fell from said wagon, and thereby startled and frightened the said horses of defendant, and caused them to get beyond the control of defendant's said servant."

Though one horse appears to have been frightened by, and running because of, the snapping of the sheet, yet the evidence would warrant a finding that the fall of the box and the driver startled the other horse, causing her to run and escape from the control of the driver, and that this fall of the driver and the box was due to negligence chargeable to defendant, and was a proximate cause of the team, as a team, running away as the complaint has charged.

Plaintiff's exception to the direction of nonsuit sustained, the order directing dismissal of the complaint reversed, and a new trial granted, with costs to appellant to abide the event. All concur, except Mc-LENNAN, P. J., who dissents and votes for affirmance.